IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELAINE STITES, et al.,            :      CIVIL ACTION
                                  :      NO. 09-392
          Plaintiffs,             :
                                  :
     v.                           :
                                  :
ALAN RITCHEY, INC.,               :
                                  :
          Defendant.              :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          JANUARY 10, 2011


I.    **INTRODUCTION**

        This case arises under 42 U.S.C. § 1981 ("§ 1981"),

Title VII, and the Pennsylvania Human Rights Act ("PHRA").

Plaintiff Elaine Stites ("Stites"), Plaintiff Lauren Ball

("Ball"), and Plaintiff Barbara Buchman ("Buchman") (collectively

"Plaintiffs"), bring this cause of action against Defendant Alan

Ritchey, Inc. ("Defendant").   Plaintiffs allege that they were

terminated from their employment at Defendant's plant due to race

discrimination and retaliation.[1]   (Pl. Compl. ¶¶ 30-44.)

Plaintiff Stites is the only Plaintiff that exhausted all

_____

        [1]      While Counts II and III of Plaintiffs' Complaint
reference national origin discrimination, Plaintiffs' response to
Defendant's motion for summary judgment makes clear that
Plaintiffs are not seeking relief based on national origin
discrimination.   (Pl. Resp. at 8 ("This is not a national origin
case by any stretch."); ("This is not about a birthplace, but
about white people being discriminated against in favor of
Asians. . . .").)

administrative remedies.  (Id. ¶¶ 31, 35.)   As such, Plaintiff Stites is the only Plaintiff who brought her reverse race discrimination claim under Title VII, the PHRA, and § 1981. Since § 1981 claims do not require exhaustion of administrative remedies, Plaintiffs Ball and Buchman proceed solely on that basis.  For the reasons set forth below, Defendant's motion for summary judgment will be granted.


## II. BACKGROUND[2]

Defendant is a supplier to the United States Postal Service ("USPS") and services mail transport equipment pursuant to a contract with the USPS.  Defendant receives mail transport equipment from the USPS on tractor trailers, sorts the equipment by type, classifies it as serviceable, defective, or condemned, repairs it if necessary, audits it in accordance with procedures and standards of the USPS, and loads it for shipment.  Defendant hires various service employees to perform the necessary tasks on mail transport equipment.  Among the service employee positions are loaders, inspectors, and material handlers.  (Heins Cert., Def.'s Ex. G.)

Plaintiffs all worked as full-time inspectors on the first-shift under the management of Arlene Yorgey ("Ms. Yorgey"),

_____

[2]     Many facts are uncontested.  To the extent this is not so, the facts are viewed in the light most favorable to the Plaintiffs.

Daniel Murphy ("Mr. Murphy"), and/or Marge Sassany ("Ms. Sassany"). (Pl. Statement of Mat. Facts ¶¶ 10, 12, 14, 19, 21.) Inspectors are given large boxes/containers from unloaders. These boxes/containers contain bags, sleeves, containers/trays, and other products to be inspected. Inspectors are rated on how quickly they are able to inspect and stack mail transport equipment on pallets they are assigned to inspect, and they are given efficiency ratings based on their output errors. (Id. ¶ 3-9.)

To measure inspector efficiency, Defendant utilizes a formula originally developed by the USPS, which measures how quickly an inspector services mail transport equipment. Defendant implements a minimum weekly efficiency rating, and since January 2006 that minimum is 170. Failure to meet the minimum weekly efficiency rating can result in progressive discipline leading to suspension and termination. If an inspector does not maintain minimum weekly efficiency ratings or has other performance issues (i.e., failing to locate mail in the equipment), the inspector can receive employee counseling reports. (Heins Cert. ¶¶ 11-14, Def.'s Ex. G; 2003 Alan Ritchey Handbook at 43-44, Def.'s Ex. M; Yorgey Dep. at 17-18, 232-35.)

In early 2006, Defendant experienced a steady reduction in volume of mail transport equipment arriving at the location where Plaintiffs worked. During this time, Defendant implemented

a reduction in force, resulting in six layoffs.  A year later, in
2007, under the then-anticipated November 2007 contract renewal
with USPS, Defendant was aware it would receive a reduced per-
piece compensation rate for each item of mail transport equipment
it serviced.  Additionally, the overall amount of mail transport
equipment arriving continued to decline.  At that time, Defendant
decided to streamline its process for servicing mail transport
equipment by consolidating two shifts and becoming a one-shift
operation.  Also, Defendant implemented another reduction in
force and a new processing procedure requiring all inspectors to
receive a minimum weekly efficiency rating of 170.  (Heins Cert.
¶¶ 15, 19, 20-23, Def.'s Ex. G; Murphy Dep. at 23-24, 29-31.)

During 2006-2007, all three Plaintiffs were terminated
by Defendant.  Plaintiffs allege that the terminations violated
their civil rights as well as federal and state statutes
prohibiting discrimination.

## III. DISCUSSION

All three Plaintiffs seek recovery pursuant to § 1981,
alleging that Defendant engaged in reverse race discrimination
and retaliation.  Additionally, Plaintiff Stites has asserted
reverse race discrimination under Title VII and the PHRA.
Defendant has moved for summary judgment.

## A. Legal Standard for Summary Judgment

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

"After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P.

56(e)(2).

B.    <u>Legal Standard to Establish Reverse Race Discrimination
      Pursuant to § 1981, Title VII, and the PHRA</u>[3]

With respect to Plaintiffs' reverse race discrimination

claims, the Third Circuit applies a "modified burden shifting

analysis."[4]  An employer who discriminates does not typically

disclose a discriminatory animus; therefore, the Supreme Court

created a modified burden shifting analysis to allow plaintiffs

to bring discrimination claims even though they lack direct proof

_____

        [3]    In Count III of Plaintiffs' Complaint, Plaintiffs
suggest they are entitled to relief on the basis of ethnic
discrimination.  For purposes of this memorandum, a claim of
ethnic discrimination will be treated as a claim for racial
discrimination.  <u>See</u> <u>Saint Francis Coll. v. Al-Khazraji</u>, 481 U.S.
604, 613 (1987) ("[W]e have little trouble in concluding that
Congress intended to protect from discrimination . . . persons
who are subjected to intentional discrimination solely because of
. . . ethnic characteristics.  Such discrimination is racial
discrimination that Congress intended § 1981 to forbid . . . .").

        [4]    The same analysis is applicable to claims brought under
§ 1981, Title VII, and PHRA; therefore, the § 1981 claims will be
subject to the same analysis as the Title VII and PHRA claims of
Plaintiff Stites.   <u>See</u> <u>Pamintuan v. Nanticoke Mem'l Hosp.</u>, 192
F.3d 378, 385 (3d Cir. 1999) ("We analyze section 1981 claims
under the familiar <u>McDonnell Douglas</u> shifting burden framework
used in Title VII discrimination case."); <u>Coulton v. Univ. of
Penn.</u>, 237 F. App.'x 741, 747 (3d Cir. 2007) (applying <u>McDonnell
Douglas</u> framework to § 1981 and PHRA claims); <u>Gomez v. Allegheny
Health Servs., Inc.</u>, 71 F.3d 1079, 1084 (3d Cir. 1995) ("The
state Act is construed consistently with interpretations of Title
VII.").

of discrimination.  See Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir. 1999).  Under this analysis, each plaintiff carries the initial burden and must establish a prima facie case of racial discrimination by a preponderance of the evidence.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2009).

Once the prima facie case is established, "the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.'"  Id. (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  Although the burden of production shifts to the defendant "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993) (internal marks omitted).  If the employer puts forth a legitimate nondiscriminatory reason, the presumption of discrimination raised by plaintiff's prima facie case is rebutted, and "[t]he plaintiff must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination."  Sarullo, 352 F.3d at 157.

### 1.  The Prima Facie Case

Whether a plaintiff has established a prima facie case is a question of law.  Id.  Establishing a prima facie case

requires the plaintiff to show that: "(1) [he/she] belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) [this occurred] under circumstances that raise an inference of discriminatory action." Id. In reverse discrimination cases, the Third Circuit does not place a higher burden on plaintiffs who are not in a minority class. Iadimarco, 190 F.3d at 163. The Supreme Court has recognized that the dictates of Title VII "are not limited to discrimination against members of any particular race [and Title VII] proscribe[s] racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites." McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 278-79 (1976).

In this case, all three Plaintiffs allege they are in a protected class because they are white. Second, they allege they were qualified for their positions as mail transport inspectors because each was an employee of the Defendant for almost eight years. Third, each Plaintiff has demonstrated that she was subject to an adverse action because each was terminated. As for the final element of the prima facie case, Plaintiffs must demonstrate, by a preponderance of the evidence, that they were terminated based on their race.

Plaintiffs argue that they were terminated because Defendant favored Asians over whites. Plaintiffs state that this

favoritism manifested in various ways such as Defendant giving
Asians easier work.  (Stites Dep. at 99, 102, 124, 126, 128;
Marlin Dep. at 102-03, 144, 156.)  Additionally, Plaintiffs
allege that Defendants catered to Asian workers' needs more
attentively by allowing them to leave early to lunch.  (Ball Dep.
at 96-97, 306-07.)  Plaintiffs also state that Defendant favored
Asians because Defendant removed an American flag that allegedly
offended Asians.  (<u>Id.</u> at 81, 258, 277.)

Plaintiffs advance various other arguments to establish
that Defendant favored Asians and this favoritism was the reason
for Plaintiffs' terminations.  Plaintiffs support all their
allegations with anecdotal evidence from their own depositions
and the depositions of three other co-workers who are not named
parties.  Most of Plaintiffs' arguments are adequately disputed
by Defendant, but there are some facts of record (<u>i.e.</u>, the real
reasons the American flag was removed and Asians were allowed to
leave early to lunch) which could potentially lead to an
inference of favoritism.  Under these circumstances, Plaintiffs
have established a prima facie case of race discrimination.

2.  <u>Legitimate Nondiscriminatory Reason</u>

Once a plaintiff establishes a prima facie case, a
presumption of discrimination arises.  This presumption is
rebutted if the defendant "articulate[s] some legitimate,

nondiscriminatory reason for the employee's [termination]."

McDonnell, 411 U.S. at 802.  This burden of production rests on

the defendant and is a low standard.  Iadimarco, 190 F.3d at 157

("[T]he Defendant need not persuade the court that it was

actually motivated by the proffered reasons." (internal marks

omitted)).  "The defendant satisfies its burden at this step by

introducing evidence which, taken as true, would permit the

conclusion that there was a nondiscriminatory reason for the

unfavorable [action]."  Anderson v. Wachovia Mortgage Corp., 621

F.3d 261, 271 (3d Cir. 2010) (internal marks omitted).  Here,

Defendant offers adequate nondiscriminatory reasons, generally

based on performance deficiencies, as to why each Plaintiff was

terminated.

First, as to Plaintiff Ball, Defendant explains that

Plaintiff Ball was laid off due to Defendant's early 2006

reduction in force.  During this reduction in force, Defendant

states it used objective, performance-based criteria to rate and

compare employees.[5]  (Yorgey Dep. at 248-50.)  Plaintiff Ball had

---

[5]     Defendant analyzed which employees to lay-off by
creating workforce analysis charts that examined the employees'
job efficiency, attendance, number of employee counselings, and
job skills.  (Yorgey Dep. at 249.)  The then-first shift manager,
Ms. Yorgey, prepared a job analysis chart that took these factors
into consideration.  Defendant then used this chart to compare
the job performances of inspectors and determine which inspectors
should be retained.  (Id. at 248-50.)  Plaintiff Ball had the
lowest total score of inspectors who were compared, and she was
laid off.  (Id. at 265.)  Plaintiffs Buchman and Stites, however,
who had scores of 223 and 225, respectively, compared favorably
to other inspectors and were not laid off.  (Id. at 265-66.)

the lowest total score out of all 184 inspectors who were evaluated. (Id. at 265.) The individual with the next lowest score was also fired. (Id.) During this reduction in force, whites were not the only individuals laid off. An Asian employee was laid off due to this employee's low rating score. (Id.) Meanwhile, many non-Asians without low scores survived the reduction in force due to their favorable scores. (Id. at 265-66; Def.'s Supp. Answers to Pl.'s First Set of Inter. at no. 15, Def.'s Ex. Q.) Thus, it was not discrimination, but rather Defendant's need to reduce its work force and Plaintiff Ball's low score that resulted in Plaintiff Ball's termination.

Similarly, Plaintiff Buchman was laid off during a 2007 reduction in force. (Yorgey Dep. at 37.) According to Defendant, economic circumstances and the company's anticipated reduced compensation rate from its main employer led to Defendant's decision to reduce its work force. Similar to the 2006 reduction in force, Defendant states that it used objective, performance-based criteria to determine which employees should be terminated.[6] Plaintiff Buchman was in the group of individuals

_____

Many other non-Asian inspectors survived the reduction in force. (Id.)

[6] Mr. Murphy and Ms. Yorgey created a job analysis chart similar to the chart Ms. Yorgey created during the 2006 reduction in force. (Murphy Dep. at 57-59; Yorgey Dep. at 24-32.) After comparing the performances of inspectors, Defendants found that the ratings of the second-shift employees were better overall. (Murphy Dep. at 58-63; Yorgey Dep. at 31-32.) Additionally,

with low scores, she had a score of 185.  (Id.)  Plaintiff Stites

had a score of 206, and she was the employee with the lowest

total score who survived the 2007 reduction in force.  (Id. at

74-75.)  As with the 2006 reduction in force, Asians with low

scores were laid off and Non-Asians with high scores were not

terminated.  (Id.)  As such, Plaintiff Buchman's termination was

not due to discrimination, but rather because of Defendant's need

to reduce its work force and Plaintiff Buchman's low score.

As for Plaintiff Stites, Defendant claims she was

terminated for her failure to maintain a minimum weekly

efficiency rating of 170 between April 2007 to August 2007.  (Id.

at 275-79.)  Despite receiving verbal and written warnings,

Plaintiff failed to meet the requisite score of 170.[7]  At one

point, Plaintiff Stites was placed on suspension; however, her

scores remained low.  As a result of her continuous low scores,

Plaintiff Stites was laid off.  Whites were not the only

_____

Defendant discovered that Plaintiff Buchman received a total
score of 185, which was among the lowest of the first-shift
inspectors.  (Yorgey Dep. at 37.)  Consequently, Plaintiff
Buchman was one of the fifteen employees laid off in this
reduction of force.  (Id.)  Plaintiff Stites, along with other
non-Asians, survived the 2007 reduction in force.  (Id. at 74-
75.)

[7]    On April 30, 2007, Plaintiff Stites received a verbal
warning.  Next, on May 15, 2007, she received a written warning.
Again, on June 18, 2007, Plaintiff was suspended without pay for
one day for having an efficiency rating of 154.64.  Finally, on
September 4, 2007, Plaintiff was terminated for having an
efficiency rating of 168.51.  (Stites Counseling Reports, Def.'s
Ex. AA.)

individuals laid off for failing to meet the minimum weekly efficiency ratings; Asian workers were also disciplined and some were eventually laid off.  For example, an Asian employee was terminated for the same reason and in the same month as Plaintiff Stites.  (Id. at 183)  Consequently, Plaintiff Stites was terminated due to her own performance deficiencies and not because of discrimination.

Based on the foregoing, Defendant has supplied legitimate nondiscriminatory reasons for the Plaintiffs' terminations thereby rebutting the presumption of discrimination.

### 3.    Pretext

After a defendant offers a legitimate non-discriminatory reason for termination, "the presumption raised by the prima facie case . . . drops from the case." St. Mary's Ctr., 509 U.S. at 507 (internal marks omitted).  At this point, plaintiff "must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating . . . cause of the employer's action." Iadimarco, 190 F.3d at 165-66.  In other words, the plaintiff must provide evidence to "allow a factfinder reasonably to infer that each of the employer's proffered nondiscriminatory reasons [were] either

a post hoc fabrication or otherwise did not actually motivate the employment action." Id. at 166 (internal marks omitted). The burden of persuading the trier of fact that the alleged acts constituted unlawful discrimination remains with the plaintiff. See St. Mary's Ctr., 509 U.S. at 507 (discussing burdens under McDonnell Douglas analysis).

In this case, Plaintiffs allege Defendant's reasons are a pretext, and that the workforce analysis charts used to rate and compare the employees during the 2006 and 2007 reductions in force are post hoc fabrications.

a.   2007 Workforce Analysis Chart

As to the 2007 reduction in workforce analysis chart, Plaintiffs' main argument is that two witnesses' answers to depositions implicate perjury when read in conjunction with their depositions in a prior case. Plaintiffs argue that this discrepancy in testimony creates a genuine issue of material fact as to whether the 2007 work force analysis chart was created post hoc to defend against claims brought by the Equal Employment Opportunity Commission ("EEOC").

Plaintiffs discuss the fact that Ms. Yorgey, one of the individuals who created the 2007 workforce analysis chart, did not indicate, in a separate lawsuit, that the 2007 workforce analysis chart presented in that case was made after the 2007

reduction in force.  In this case, however, Plaintiffs were made
aware that the 2007 chart was a re-creation of the original 2007
reduction in force chart as of June 23, 2009.  Moreover, during
the deposition of Ms. Yorgey, defense counsel elicited from Ms.
Yorgey the background events leading to the chart's re-creation.

At the deposition, Ms. Yorgey discussed, in depth, the
reason the chart was re-created and how it was re-created.
(Yorgey Dep. at 279-88.)  Ms. Yorgey stated that she prepared the
original reduction in workforce analysis chart in January 2007,
the chart was maintained on her computer, and her computer
crashed soon thereafter.  After contacting the database help
desk, Defendant was unable to repair the computer.  At that time,
Defendant received notice from the EEOC requesting disclosure of
certain material used in connection with the 2007 reduction in
force. Given that the original chart was on Ms. Yorgey's old
computer and no longer accessible, Ms. Yorgey and Defendant's
human resources representative determined that the analysis chart
could be recreated using the same template and sources of
information utilized for the original chart.  (Id.)

The sources of information used to prepare and re-
create the original 2007 analysis chart were from Defendant's
business records.  (Id.; Taylor Dep. at 63.)  All materials that
went into completing each column of the chart were attained from
mail transport equipment software, attendance books, and personal

files.  (Yorgey Dep. at 279-88.)  As for the job skills column of the chart, the points assigned in this column were assigned by Ms. Yorgey, one of the individuals involved in the chart's re-creation.  (Id.)  Accordingly, all the columns in the chart were re-filled by the same ultimate sources used in creating the original chart, and these sources were all provided to Plaintiffs during discovery.[8]

Plaintiffs do not point to any flaw in the information in the chart nor do they point to any flaw in how the re-created chart was completed.  Plaintiffs have the back-up documentation used to create both the original 2007 analysis chart and the re-created chart, and they fail to establish any inconsistencies between the supporting documentation and the re-created chart.  In the absence of some flaw in the data used to re-create the 2007 workforce analysis chart, Plaintiffs cannot defeat Defendant's legitimate nondiscriminatory reason and establish that this chart is a fabrication by merely pointing to the fact that the chart is a re-creation of the original 2007 workforce analysis chart.

b.  2006 Workforce Analysis Chart

As for the 2006 workforce analysis chart, Plaintiffs suggest Defendant engaged in similar post hoc fabrication of

---

[8]  At the deposition, Plaintiff's counsel questioned Ms. Yorgey about these sources.

certain materials in an effort to hide a discriminatory motive
for the termination of Plaintiff Ball.  To support this
allegation, Plaintiffs underscore the fact that Defendant
produced a 2006 workforce analysis chart which evaluated second-
shift non-inspectors, very late in the discovery process.  (Pl.
Statement of Mat. Facts ¶ 160.)  This, however, is irrelevant as
to whether Defendant's ratings of Plaintiffs were accurate or
fabricated because Plaintiffs were all first-shift inspectors.
The second-shift non-inspector chart was not utilized when
comparing first-shift inspectors and deciding who to terminate in
2006.

        To establish that Defendant's proffered legitimate
reason for firing Plaintiff Ball was a pretext, it is not enough
to claim that the aforementioned chart was produced late in
discovery.  Plaintiffs must point to some flaw in the data
contained in the 2006 first-shift inspector workforce analysis
chart.  These Plaintiffs fail to point to any flaw in the 2006
workforce analysis chart.  The 2006 workforce analysis chart for
first-shift inspectors was provided to Plaintiffs in June 2009 in
Defendant's first document production.  Plaintiffs have failed to
point to any evidence of record to create a genuine issue of
material fact as to the data in the 2006 workforce analysis chart
for first-shift inspectors.  As such, Plaintiffs have not shown
that Defendant's legitimate nondiscriminatory reason as to

Plaintiff Ball's termination is a pretext.

### c. Mr. Murphy's Scratch Paper

Additionally, Plaintiffs allege that Defendant must be falsifying documents because Defendant produced, late in discovery, scratch sheets from Mr. Murphy, a shift manager. (Murphy Dep. at 164-67; Murphy Handwritten Notes, Pl. Ex. W.) The information on Mr. Murphy's notes relates to the 2007 reduction in force. This information was used in determining what positions and employees may need to be retained in connection with a process change being implemented in connection with the 2007 reduction in force.

The material found on Mr. Murphy's notes does not contradict any of the data contained in the 2007 workforce analysis chart that was used to compare first-shift inspectors. (Murphy Dep. at 108-18.) Consequently, this does not create a genuine issue of material fact as to whether Defendant's motive for firing Plaintiffs was work force related.

### d. Stray Remarks

Next, Plaintiffs attempt to establish that Defendant favored Asians over whites based on alleged stray remarks made by the then manager of the first-shift inspectors, Ms. Yorgey, and a supervisor Ms. Sassany. Plaintiff Stites stated that, in early

2006, Ms. Yorgey told Plaintiff that "Asians work better" and "[t]hey don't complain." (Stites Dep. at 60-61, 87-88.) Additionally, Plaintiff Ball testified that her supervisor, Ms. Sassany, told Plaintiff "what great workers [Asians] were" and that "they didn't complain and they worked faster." (Ball Dep. at 80, 151-52.)

Defendant disputes whether these comments were actually made. But even if they were, Plaintiffs do not point to any evidence of record connecting these comments with the relevant decision making processes—the preparation of the workforce analysis charts or the determination of whether employees failed to meet the minimum efficiency requirements.

When considering whether stray remarks are probative of discrimination, the Court considers three factors: (1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the purpose and content of the statement; and (3) the temporal proximity of the statement to the adverse employment decision. Parker v. Verizon Pa., Inc., 309 F. App'x 551, 559 (3d Cir. 2009) (citing Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997)) (holding remarks related to plaintiff's restrictions caused by plaintiff's disability did not establish pretext because they were made seven months before plaintiff's termination).

The first <u>Ryder</u> factor weighs in favor of Plaintiffs because the statements were made by Plaintiffs' direct supervisors. In fact, one of the supervisors participated in creating the workforce analysis charts that were used to compare employees and determine who should be terminated. This, however, is not dispositive because other management personnel, such as Mr. Murphy, were involved in the creation of the workforce analysis charts and stray remarks have not been attributed to these individuals. Additionally, although Ms. Yorgey completed the work force analysis charts, the data used in the charts was from sources not generated by Ms. Yorgey. For example, attendance information was found in attendance books and efficiency ratings were taken from mail transport software. Plaintiffs point to nothing that calls into question the accuracy of these underlying sources.

The second and third <u>Ryder</u> factors do not weigh in Plaintiffs' favor. Plaintiffs point to the alleged stray remarks in order to suggest that there was a corporate policy of creating a workforce of Asians. However, Plaintiffs have not pointed to evidence of record disputing that during Defendant's reductions in force it fired both Asians and whites. (Yorgey Dep. at 74-75, 183, 265.) Also, during the alleged period of discriminatory animus, whites were hired by Defendant. (Def.'s Supp. Answers to Pl.'s First Set of Inter. at no. 15, Def.'s Ex. Q.) In fact,

during this time, Plaintiff Buchman and other non-Asians were offered re-employment to work on special projects. (Taylor Dep. at 117-21.) As for the third Ryder factor, which addresses temporal proximity between the stray comment and adverse action, Plaintiff Stites states that the comments made to her were made in early 2006; however, she was not fired until 2007, a year later. See Parker, 309 F. App'x at 559 (holding remarks related to plaintiff's restrictions caused by plaintiff's disability did not establish pretext because they were made seven months before plaintiff's termination).

Though Yorgey's and Sassany's comments, if made, were unprofessional, they are not sufficient in and of themselves to show that Defendant's decision to terminate Plaintiffs' employment was more likely than not the result of discriminatory bias rather than Plaintiffs' poor rating scores and inability to meet the necessary efficiency requirements. Even viewing the facts in the light most favorable to Plaintiffs, the Court finds that the no reasonable jury could find that Defendant's legitimate nondiscriminatory reasons are post hoc fabrications or otherwise did not actually motivate the adverse employment action.

e.    Selective Discipline and Systematic
        Replacement

Plaintiffs also claim that Asians were favored because

they were selectively disciplined and given easier work. Plaintiffs fail, however, to refute the evidence of record indicating that Asians and non-Asians were evenly disciplined. Defendant repeatedly issued counseling reports and notices to Asian employees for the same types of performance issues, and with the same frequency, as were issued to Plaintiffs. (Def.'s Employee Counseling Reports, Def.'s Ex. CC-JJ.) In fact, Plaintiff has not rebutted documentary evidence that Defendant issued counseling reports to Asian employees as frequently as or less than it did to Plaintiffs. (Yorgey Dep. at 171-79.)

Furthermore, Plaintiffs' "extensive favoritism towards Asians" theory fails because Plaintiffs fail to rebut the evidence that Asian employees were laid off or terminated at the same time as Plaintiffs and for the same reasons. Plaintiffs also fail to refute the fact that during the reductions in force many non-Asians were not terminated. In particular, Plaintiffs' theory that Asians were favored and given easier work is refuted by the fact that many non-Asian employees had strong job performance scores and survived the 2006 and 2007 reductions in force. Based on the foregoing, Plaintiffs have failed to establish that the motivating reason for terminating Plaintiffs was favoritism towards Asians and that there was an inconsistency in treatment of Asians and non-Asians.

Plaintiffs also argue that there was systematic

replacement of Defendant's entire workforce with Asian employees throughout the time Plaintiffs allege they were discriminated against. This argument, however, ignores the evidence of record which indicates that at least twenty employees, who voluntarily identified their race as other than Asian, were hired by Defendant in 2006 and 2007. (Def.'s Supp. Answers to Pl.'s First Set of Inter. at no. 15, Def.'s Ex. Q.) Moreover, Plaintiffs' argument that Defendant only permitted Asian employees to refer job applicants, at the time Plaintiffs claim they were discriminated against, is undermined by the evidence of record. Seven individuals were referred to Defendant by white employees. In fact, Plaintiff Stites referred her nephew to Defendant and he was hired. (Stites Dep. at 120-21; Taylor Cert. ¶¶ 4-10.)

Overall, Plaintiffs have not pointed to evidence of record to discredit Defendant's proffered legitimate nondiscriminatory reasons nor shown that discrimination was more likely than not a motivating or determinative cause of the adverse employment actions at issue. Consequently, Defendant's motion for summary judgement as to Plaintiffs' claims of reverse race discrimination will be granted.

C. Retaliation

Plaintiffs cannot establish a claim for retaliation under § 1981. CBOCS West, Inc. v. Humphries, 553 U.S. 442, 448

(2008) (holding § 1981 encompasses retaliation claims).  To
prevail on a claim for retaliation, "an employee must prove that
(1) she engaged in a protected employment activity, (2) her
employer took an adverse employment action after or
contemporaneous with the protected activity, and (3) a causal
link exists between the adverse action and the protected
activity."  Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007)
(internal marks omitted).

As to the first Andreoli factor, all Plaintiffs allege
that they engaged in a protected employment activity by
complaining to Defendant about the influx in the Asian workforce.
See Lue-Martin v. March Group L.L.L.P., 379 F. App'x 190, 193 (3d
Cir. 2010) (recognizing complaints as protected activity).  As to
the second Andreoli factor, all three Plaintiffs can establish
that they were subject to an adverse employment action after they
engaged in the protected activity because each was terminated.
However, Plaintiffs have not provided sufficient evidence to
satisfy the third Andreoli factor—a casual connection between the
protected activity and the adverse employment action.

Two of the three Plaintiffs, Plaintiffs Ball and
Buchman, cannot establish a casual connection because they both
admitted during their depositions that they did not believe
Defendant retaliated against them.  (Ball Dep. at 228-29; Buchman
Dep. at 147.)  Additionally, even assuming Plaintiff Stites

complained of unlawful discrimination during her employment, she cannot establish a causal connection between her complaints and her termination. When the temporal proximity between the employee's complaint and the adverse action is unusually suggestive the temporal proximity "is sufficient standing alone to create an inference of causality." <u>LeBoon v. Lancaster Jewish Cmty. Ctr.</u>, 503 F.3d 217, 232 (3d Cir. 2007). On the other hand, when temporal proximity is not suggestive, "the proffered evidence, looked at as a whole, may suffice to raise the inference." <u>See</u> <u>id.</u> (stating the court can consider "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus.").

Here, Plaintiff Stites stated that she began complaining about Asian favoritism sometime in 2006, but she was not fired until September 2007.[9] (Stites Dep. at 188-89.) The time period of one year between Plaintiff Stites' alleged 2006 complaints and her September 2007 termination is not suggestive of retaliation. <u>See</u> <u>LeBoon</u>, 503 F.3d at 231-32 (holding a gap of

---

[9] In Plaintiff Stites' deposition she states that she made her first complaint in 2006, but she is unsure of the exact date she made her complaint. (Stites' Dep. at 158-59.) This fact does not alter the Court's decision because even if Plaintiff made her complaint December 31, 2006, over eight months elapsed until the time Plaintiff was terminated.

three months between complaint and adverse action is not suggestive of retaliation). Moreover, Plaintiff has not explained why she was not laid off in the early 2007 reduction in force, if, as she claims, she began complaining in 2006 and was retaliated against for such complaints. Plaintiff has not proffered sufficient evidence to allow a reasonable juror to find a causal link between Plaintiff Stites' protected employment activities and the alleged adverse employment actions taken by her employer.

Based on the foregoing, Plaintiffs have not pointed to record evidence by which a jury could reasonably find Defendant retaliated against Plaintiffs. Defendant's motion for summary judgment as to this claim will thus be granted.

## IV. CONCLUSION

For the reasons noted, Defendant's motion for summary judgment as to all of Plaintiffs' claims will be granted. An appropriate Order will follow.